Filed 11/5/15  In re Tey. T. CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re TEY. T., et al., Persons Coming Under the Juvenile Court Law. | B263495 (Los Angeles County Super. Ct. No. CK60784) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. Sasha M., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Zeke Zeidler, Judge.  Affirmed.

Merrill Lee Toole, under appointment by the Court of Appeal, for Defendant and Appellant.

Valerie N. Lankford, under appointment by the Court of Appeal, for Defendant and Respondent E.C.

No appearance for Plaintiff and Respondent.

_____

Sasha M. (minor) appeals from the dependency court's order returning minor to the custody of E.C. (mother) after two years of reunification services, under Welfare and Institutions Code section 366.25, subd. (a)(1).[1]  Inherent in the court's decision is a determination that neither minor's counsel nor the Los Angeles County Department of Children and Family Services (Department) proved by a preponderance of the evidence that minor would be at substantial risk of detriment in mother's custody.  Minor contends the court placement order erroneously ignored substantial evidence establishing a risk of detriment.  Mother, as respondent on appeal, contends the court's decision is supported by substantial evidence.  Because the statute requires the court to return a child to parental custody absent a finding that return would pose a substantial risk of detriment, and because there is substantial evidence to support the court's placement decision, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Mother has seven children ranging in age from 18 months to 21 years old.  The youngest four are girls:  fifteen-year-old Tey., seven-year-old Sav., four-year-old Sasha, and eighteen-month-old El.  K.M. (father)[2] is the biological father of the youngest three girls.[3]

---

[1] All further statutory references are to the Welfare and Institutions Code, unless otherwise indicated.

[2] Father is not a party to this appeal.

[3] Mother's older children are no longer minors:  21-year-old Tra. and her two younger brothers, 20-year-old Tre., and 19-year-old Thi.

**Earlier Proceedings**

This court has decided one other appeal related to the current dependency proceeding, affirming the dependency court's jurisdictional findings and removal orders, based on allegations that the children were at risk of harm because mother disbelieved an older daughter's accusation that father had sexually abused her, and mother's failure to adequately provide for her children Tre. and Tey. We excerpt from our earlier opinion (*In re Tey. T.* (Apr. 30, 2014, B250449) [nonpub. opn.])[4] relevant details about the family's involvement with the dependency system:

"The current case is the family's third dependency proceeding. The Department filed the first petition in June 2006. Mother's younger son, Thi., was nine at the time and had been hospitalized twice for severe emotional disturbance and diagnosed with a number of mental health disorders. Mother had initially entered into a voluntary family maintenance contract, but then refused to cooperate and would not allow mental health professionals to assist Thi. The Department filed a petition after Tra., Tre., and Tey. reported suffering both physical and mental abuse. The dependency court detained the children from mother and released them to [their biological father.] . . . The court sustained the petition on April 3, 2007, but in the interim, mother had given birth to Sav. in July 2006. Mother did not cooperate with the Department's requests to see Sav., and when the social worker attempted to visit mother and K.M., the home was vacant and there was an eviction sign in the window. The Department filed a petition on behalf of Sav., obtained a protective custody warrant, located Sav., and placed the infant in foster care. On May 15, 2007, the court sustained a supplemental petition filed on behalf of Sav. By July 2007, four of the siblings were placed with the maternal aunt, and both mother and K.M. were participating in reunification services. After enrolling in various parenting classes, [m]other and K.M. regained custody of all five children in January

---

[4] Respondent incorporated the facts from the earlier appeal under California Rules of Court, rule 8.147(b).

3

2008, and the team providing mental health wraparound services to Thi. was confident that mother would ensure continued mental health services for him. The court terminated jurisdiction in July 2008.

"The family again came to the Department's attention in February 2011 when mother left Thi. with [his father], who was unable to care for the boy. Thi. reported that he and his siblings had not been to school in over four years, and mother and K.M. did not provide enough food to the family. The Department was unable to locate the other siblings, but filed a petition in May 2011 naming all six children. The court issued protective custody warrants for the missing children, and arrest warrants for mother and K.M.

"The Department was unable to locate the family until March 2012, when K.M.'s mother called the Department to report that the children had been dropped off at her home. The Department interviewed the children, who reported that they did not have contact information for their parents, but that Thi.'s allegations were untrue. They claimed to be properly homeschooled and denied any abuse. Mother and K.M. entered into a voluntary contract with the Department, and the petition was dismissed in June 2012. Part of the contract was an agreement to enroll the children in school or in a certified homeschooling program.

"In August 2012, Tra. filed a police report with the Palmdale Sheriff's Department alleging K.M. had raped her on multiple occasions. In the police report, Tra. claimed that the rape occurrences began when she was 16 and continued until May 2012. They took place when mother was not home. In July 2012 and again in October 2012, the Department received reports that Tra. had disclosed she had been sexually abused by K.M. In both instances, social workers interviewed family members and concluded the reports were unfounded.

"The Department received another report about the family on December 16, 2012, when Tre. and Tey. sought to leave the home to live with [their father]. Four days later, [the father] dropped Tra., Tre., and Tey. off at a Los Angeles police station, stating he was unable to care for the children, and that mother was still receiving financial

4

assistance for them. Tre. and Tey. reported going to mother's home earlier that day to obtain a letter from mother permitting [their father] to care for them, but she refused to let them into the house.

"At the adjudication hearing, Tra. testified that K.M. first sexually abused her when Sasha was an infant. He sent the other siblings to the park, and when Tra was putting Sasha down to sleep, 'he was in there, and he came and got close to me. And, basically -- he did oral to me and, like, climbed on top of me.' Afterwards, she told Tey., but did not tell mother. On at least two occasions, K.M. penetrated her with his penis. The abuse ended when she was placed in foster care as part of the 2011 case. She did not tell anyone in the Department about the abuse because she was embarrassed.

"Tey. testified that Tra. told her of the abuse, but she never witnessed K.M. sexually abusing Tra. She said she originally denied knowing of any abuse because she did not want to believe it. Mother testified she never left Tra. alone with K.M., and did not believe that K.M. had abused Tra. as Tra. alleged.

"The court found no evidence that mother had been told of the abuse, but also noted that 'the children didn't really have a chance to express what was going on to the mother. She discouraged any of that sort of communication.'"

On June 12, 2013, the court ordered mother to complete the following reunification services: (1) conjoint counseling as recommended by children's therapist; (2) individual counseling to address case issues (including child safety factors, personal responsibility, sexual abuse awareness and alternative parenting methods for out of control children); (3) sexual abuse awareness counseling; and (4) participate in all school activities including any necessary Individualized Education Programs (IEP). The court ordered monitored visits for mother and father.

**Six and Twelve-month Review Periods**

On December 16, 2013, the court ordered a psycho-educational assessment for Sasha, and granted mother unmonitored day visits with Sav. and Sasha, up to five hours a

5

visit. Father's visits remained monitored. The Department's six-month status review reports described mother as being partially compliant with reunification services. She had taken a foster care parenting class and participated in weekly individual counseling between October and December 2013, but had failed to fully address safety issues. The Department recommended that all court-ordered services be completed before the minors could be safely returned to the home. In addition, the Department recommended granting Sasha's foster parents educational rights because even though the court had previously ordered a psycho-social evaluation, the school district would not conduct the evaluation without parental consent, but mother and father had declined to consent. Finally, the Department tried to arrange a time to assess mother's home for overnight visits, but mother had failed to contact the Department to arrange a date for the assessment.

Shortly before the six-month review hearing, the Department reported that mother had moved into maternal aunt's home in January 2014, and on February 27, 2014, social workers assessed the home for overnight visits. The social workers planned to schedule a team decisionmaking meeting (TDM) with mother to go over boundaries for overnight visits, come up with a schedule, and further discuss reunification.

At the six-month review hearing on March 14, 2013, the court again ordered a psycho-educational assessment for Sasha. The Department was given discretion to permit weekend overnight visits for Tey., Sav., or Sasha, as well as discretion to walk on a "home of parent order" for any of the three girls.

After a TDM on March 18, 2014, mother began having overnight visits with both Sav. and Sasha. Mother's overnight visits with Sasha were discontinued in late May after Sasha disclosed that on a visit with her "bio mom" she slept in the bed with her "bio dad." Mother contacted the supervising social worker and denied father having any contact with girls; she claimed Sasha was lying. Mother continued having weekly unmonitored day visits with Sasha.

6

**Eighteen-month Review Period**

The Department's 18-month status review report dated August 6, 2014, stated that mother was in partial compliance with the case plan, but that the social worker had been unable to contact mother to discuss her perception of her needs. Mother's therapist reported mother had attended 28 classes, beginning in November 2013, and the therapist could prepare a report about mother's progress and goals they have covered. Mother had weekly unmonitored day visits with Sasha in May, June, and July. The report stated Sasha had disclosed that her "bio dad" was on the bus with her and told her, "I love you," during the visit on June 21, 2014.

The Department further reported that Sasha was not in preschool because "mother refuses to sign the educational appropriate paperwork." Sasha had bonded with her caregivers, who were concerned about Sasha's behavior and the absence of services to assist her. "Caregivers report that they have tried continuously to convince mother, who has educational rights to sign the necessary papers for Sasha to enroll in school but mother refuses to do so." Caregivers also were seeking an evaluation of Sasha for autism, because foster father had been unable to teach Sasha shapes, colors or the alphabet, and Sasha was twisting her hair, clothing, and linen to the point of creating holes in her clothing and sheets.

The Department recommended that the court terminate reunification services and initiate a request under the Interstate Compact for the Placement of Children for possible placement with Sasha's paternal grandmother in Louisiana. A separate report concerning Sasha's older sister Sav. recommended terminating mother's reunification services and setting a selection and implementation hearing. In that report, the Department noted that mother had not started court-ordered conjoint therapy with Sav. and explained changes in the schedule for overnight visitation by noting that during an overnight visit on May 10, 2014, mother did not return Sasha to her foster placement on the scheduled day.

On August 6, 2014, after a contested 18-month hearing, the court moved Sasha's 16-year-old half-sister Tey. from foster care to "home of parent-mother" on the condition

7

that Tey. attend school. Both Sav. and Sasha remained in foster care, and the court granted mother overnight visitation with Sav. and Sasha, conditioned on continued compliance. The court found a substantial probability that Sav. and Sasha would be returned to a parent's physical custody pursuant to section 366.21, subdivision (g). It ordered the Department to continue providing reunification services, assist mother to enroll in conjoint counseling with Sav. and Sasha, and facilitate mother's visits with the children, including transportation assistance. Finally, it ordered that the Department's next report include detailed current academic information, current medical information, and detailed visitation information consistent with the court's protocol.

**Twenty-four-month Review Period**

The Department's 24-month status review report dated November 18, 2014, continued to describe the children to be at "high" risk for future abuse or neglect, highlighting the fact that although mother "is participating in some Court ordered programs, she is not being consistent with visitation with the children, consenting to IEP for Sasha, possibly allowing father unmonitored contact with the children, and not allowing [the Department] in to her home." The Department recommended terminating reunification services and setting a section 366.26 hearing.

Mother had two overnight visits with Sasha in late September and early October 2014. The Department suspended visits after discovering that mother had continued a sexual relationship with father, and he was the father of her youngest daughter, El., born on April 9, 2014. Mother did not disclose this information to the Department until October 2014, when the Department was investigating statements by Sasha that she had slept in the same bed as her baby sister and her birth father. According to mother, the last time she saw father was April 2014. On October 28, 2014, the Department filed a section 388 petition to change mother's visits to monitored, based on concerns that mother was allowing father to have contact with the children during unmonitored overnight visits. On November 10, 2014, mother's counsel filed a walk-on request seeking an order

8

requiring the Department to permit unmonitored overnight visits as previously ordered by the court on August 6, 2014.

The Department reported that since Tey. was placed with mother in August 2014, mother had not made Tey. available for in-home visits by the social workers. Mother refused to let the social worker visit Tey. in the home, and the social worker had to instead meet with Tey. at a local Starbucks. The social worker made an unannounced visit in September, and mother refused entry, so the social worker met with Tey. outside the home. In addition, when the social worker asked mother to inform her of an initial meeting with the wraparound team,[5] mother said "no," stating she has worked with wraparound in the past and does not need the Department involved with her wraparound team. On October 30, 2014, mother had not complied with obtaining wraparound services, but demanded that the Department provide her with financial assistance to obtain housing.

On November 18, 2014, the court continued both the section 388 hearing and the 24-month review hearing to allow the Department to conduct a TDM and put a safety plan into place to address safety issues with respect to Tey. and El., as well as visits with both Sav. and Sasha. The court further ordered that one or more children must be present during Sasha's visits with mother, and the Department was to conduct a predetention investigation for both Tey. and El.

Mother, foster parents, and the Department conducted a TDM and agreed on a safety plan that permitted both Tey. and El. to remain in mother's home with family maintenance services. Mother agreed to allow the Department to enter the home, to continue in conjoint therapy with Sav., to encourage Tey. to participate with the wraparound team, and to allow the Department to participate in wraparound meetings when necessary. Mother would have overnight visits with both Sav. and Sasha on the weekends. She would provide current telephone numbers to foster parents and the

[5] Wraparound services are integrated services provided by multiple agencies to assist minors in dependency proceedings.

9

Department, and foster father would make Sasha available for telephone contact with mother.

The Department reported in January 2015 that the referral relating to El. had been closed out as unfounded, but the Department was still investigating a new referral received on December 16, 2014, that mother was physically abusing Sasha as well as her older siblings. The court and the parties agreed to continue the 24-month review hearing to March for the results of the latest referral. Minors' counsel declared a conflict; he was relieved from representing Sav. but continued representing Sasha. Mother's counsel claimed mother had been unable to arrange some overnight visits, and the court ordered the Department to speak to both mother and Sasha's caretaker to resolve visitation issues. The court also gave the Department discretion to start extended visits for both Sav. and Sasha. On February 25, 2015, the court ordered the Department to provide a report on details of the earlier referrals and the Department's investigations, as well as the dates of all of mother's visits with Sasha since December 8, 2014. A last minute information report filed on March 10, 2014, stated that both referrals were closed as unfounded on January 13, 2015. Sasha had overnight weekend visits with no safety concerns, and she had her first extended visit with mother between February 20 and 26, 2015. The social worker planned to continue to liberalize visits with both children until the scheduled hearing on March 10, 2015. The Department recommended that both Sav. and Sasha be returned to mother's care.

The 24-month review hearing began on March 10, 2015, with Sasha's counsel contesting the Department's recommendation to place Sasha with mother. The court admitted into evidence the Department reports dated January 29, 2013, August 6, 2014, November 18, 2014, December 8, 2014, January 12, 2015, and March 10, 2015, as well as the Department's section 388 petition filed October 28, 2014. Minor's counsel called foster father to testify, but the testimony was cut short when a public health nurse determined that Sasha, who was present in court for the hearing, needed a breathing treatment. Mother had given her two breathing treatments in the morning before court, but did not bring the machine to administer another.

On March 12, 2015, the Department changed its recommendation regarding Sasha's placement, recommending monitored visits for mother instead, based on the fact that mother did not provide appropriate and consistent medical attention and care to Sasha when she was suffering respiratory issues during the court hearing on March 10, 2015. The report expressed concern that mother's limited knowledge of Sasha's medical condition and how to act on Sasha's behalf while she was suffering an asthma attack could be life threatening if not dealt with timely and appropriately.

**Foster Parent's Testimony**

Sasha's foster father testified that Sasha had been placed with him for 26 months. He had significant concerns about mother's willingness and ability to provide for Sasha's educational needs, particularly because mother had refused to consent to testing. He testified there had been blocks of time four or five weeks long where mother would not contact him and no visits would take place. Since the beginning of 2015, however, the length and frequency of Sasha's visits with mother had increased. After visits with mother, Sasha ate larger portions of food than normal and said she did not get enough to eat while she was with her mother. Sometimes she would return from visits smelling badly, with dirty and cracked skin, but other times she was clean, and her skin looked normal.

**Mother's Testimony**

Mother testified she was in favor of Sasha receiving services, including speech therapy and being assessed for autism. She never refused to sign an authorization regarding Sasha's education or assessment, and had authorized Regional Center services some time ago. She disputed the foster father's testimony about how much she was feeding Sasha, stating Sasha was fed three times a day, plus snacks, and never complained she was hungry.

11

Mother denied that Sasha was dirty or that her skin was cracked or bleeding while in her custody, and explained that she followed doctor's instructions to treat Sasha's dry skin with a special thick lotion, using hydrocortisone if there was any skin breakage. Mother testified she had to take Sasha to urgent care for her asthma, and was given albuterol and steroids. She gave the medications to foster father, who never gave it back when Sasha had visits with mother.

Mother began overnight visitation with Sasha in April 2014, but at times the visits would not take place because foster father would not respond to her efforts to confirm the visit, and she would need to get the social worker involved. Foster father would also tell the social worker Sasha was claiming she spent the night with her father, and the social worker would suspend overnight visits and require monitored visits but was unable to find a monitor, so mother would not have visits.

Mother testified she continued in a relationship with father after the petition in this case was sustained in 2013, and that he is the father of her youngest child El. She last had contact with him in April 2014, and had ended her relationship with him out of concern for her children's safety.

**Placement Decision**

Joining in minor's argument in favor of a detriment finding that would prevent Sasha's placement with mother, the deputy county counsel described the basis for the court's decision as a "credibility contest" between foster father and mother. The deputy county counsel described foster father's testimony as credible and objective, while mother's testimony "has a lot of holes in it." The court announced its decision as follows: "I must admit when the foster father was testifying, I had serious concerns about his concerns. I do believe that Sasha is differently situated than the other children in relation to her age and ability to report problems that arise in the mother's home. So I do think that there is one way that she's differently situated. I was definitely leaning towards [minor's counsel's] position after the foster father's testimony. [¶] But I also

12

found the mother to then be very – to have made marked progress from the beginning of this case to her testimony at these two hearings." The court found mother to be in compliance with the case plan and placed Sasha with mother under the Department's supervision, conditioned on continued compliance with the case plan.

## DISCUSSION

As minor argues on appeal, the record contains abundant evidence to support a finding that there is a substantial risk of detriment to Sasha's health and safety if she is returned to mother's custody. Our consideration of the issues minor raises on appeal is constrained both by the requirements of section 366.26, subdivision (a), and by the substantial evidence standard of review. The statute compels the dependency court to return a child to his or her parents *unless* it makes a finding that there is a substantial risk of detriment to the child's safety and well-being. (§ 366.26, subd. (a).) Viewed in the light most favorable to the order of the dependency court, we cannot conclude the decision to return minor to mother's custody is unsupported by substantial evidence. We therefore affirm.

### A. *Standard of review*

We review the court's findings for substantial evidence. (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400-1401.) In determining whether substantial evidence supports a finding, "all intendments are in favor of the judgment and [we] must accept as true the evidence which tends to establish the correctness of the findings as made, taking into account as well all inferences which might reasonably have been drawn by the trial court." (*Crogan v. Metz* (1956) 47 Cal.2d 398, 403-404.) "'"[T]he [appellate] court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence . . . such that a reasonable trier of fact could [make the findings made].'" [Citations.]" (*In re Matthew S.* (1988) 201 Cal.App.3d 315,

13

321.)  If the order "'""is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder.  [Citations.]" [Citation.]' [Citation.]" (*People v. Smith* (2005) 37 Cal.4th 733, 739.)

"We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." (*In re Matthew S., supra,* 201 Cal.App.3d at p. 321.)  If supported by substantial evidence, the judgment or finding must be upheld, even though substantial evidence may also exist that would support a contrary judgment and the dependency court might have reached a different conclusion had it determined the facts and weighed credibility differently.  (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.)  Thus, the pertinent inquiry when a finding is challenged on sufficiency of the evidence grounds is whether substantial evidence supports the finding, not whether a contrary finding might have been made.  (*Ibid.*)

**B.** **Required findings at 24-month hearing**

At each review hearing, including the 24-month review hearing, the Department must prove by a preponderance of the evidence that the child's return to parental custody would create a substantial risk of detriment to the child's safety, protection or physical or emotional well-being.  Unless the court finds substantial risk of detriment, it must return the child to parental custody.  (§ 366.25, subd. (a)(1).)

Minor emphasizes on appeal that mother received over 24 months of reunification services, despite a statutory presumption that when a child is less than three years old at the time of removal, a parent is only entitled to six months of reunification services.  (§ 361.5, subd. (b)(2).)  However, the length of time mother received reunification services does not affect our review of whether there was substantial evidence to support the court's finding that there was no risk of detriment.

14

**C.**   *The evidence supporting the finding of no substantial risk of detriment is legally sufficient*

### 1. Evidence supporting minor's argument

The record unquestionably contains substantial evidence calling into question mother's credibility and raising serious issues as to the risk of detriment to minor if returned to mother. There are three areas in which evidence directly contradicts mother's testimony: mother's approach to Sasha's educational needs, mother's willingness to grant the Department access to the home to verify the children's safety, and father's presence during Sasha's visits with mother.

Mother testified she never refused to sign an authorization to have Sasha assessed, yet the record contains no signed authorization after a lengthy dependency, and testimony from foster father as well as ongoing reports from the Department state that mother had refused to sign any releases for the school district to conduct an IEP for Sasha. There is evidence in any earlier case that Sasha's half-sibling Thi. had not been enrolled in school for four years. Two of Sasha's older half-siblings stated that mother would pretend she was enrolling the children in school or home schooling them, but then would make them stay in a room all day rather than going to school, and when Sasha's sister Sav. was detained in 2012 at the age of six, she was still not enrolled in school.

Mother's testimony that social workers had been to visit the home while Tey. was placed with mother is in direct conflict with the Department's reports stating mother was unavailable and at times refused to allow social workers access to the home to visit Tey. Mother has a documented history of evading the Department's scrutiny, including refusing to give the Department access to the home, resulting in a court-issued protective custody warrant for the Department to detain Sasha and Sav. The Department filed a petition in May 2011 based on reports that the children had not been to school for four years, but the Department was not able to locate the children until March of 2012.

15

Mother testified she was no longer in contact with father, and did not permit any contact between father and any of her children, but she admitted being in a relationship with father during the time she was having unmonitored visitation with the children. She conceived and gave birth to father's child, and later cared for the child for six months without revealing the child's existence to the Department. Instead, mother accused Sasha of lying when she claimed to have seen her father during visits. It was only due to Sasha's insistence that she had seen her father and her baby sister that the infant's existence came to light.

## 2. Evidence supporting a return to parental custody under Welfare and Institutions Code section 366.25, subdivision (a)(1)

Mother had complied with orders to participate in individual counseling and parenting classes, having obtained certificates of completion for six parenting classes and participated in 42 individual therapy sessions between October 2013 and November 2014. She maintained regular visitation with Sasha, progressively moving from monitored visits to unmonitored daytime visits. After the Department inspected the home, unmonitored overnight visits for Sasha began around April 2014. According to mother's testimony, any gaps in visitation were either due to lack of communication from foster father or the Department suspending visits while it investigated concerns about father being present during mother's overnight visits with Sasha. However, mother consistently denied that father had been at the home or had access to the children during visits. She also testified she never refused to authorize educational assessments or services for Sasha. Mother testified she fed the children three meals a day, plus snacks, and that she never used physical discipline for Sasha.

The Department had conducted investigations regarding possible detention of El. and Tey., but both referrals were closed as unfounded. Although the court found Sasha to be differently situated than her sisters, the fact that the Department found no safety concerns with allowing Tey. and El. to remain in mother's custody also weighs in favor

16

of the court's decision to place Sasha with her mother.  In ordering Sasha to be returned to mother's home, the court noted mother had made marked progress, and its decision reflects a determination that mother's testimony was more credible than foster father's.

### 3.  The order is supported by substantial evidence

Although there are significant facts in that record that would support a detriment finding, minor's contention in the final analysis is foreclosed by the standard of review, which requires us to determine whether there is substantial evidence to support the court's decision, not whether other evidence may have supported a decision to the contrary.  (*In re Dakota H.*, *supra*, 132 Cal.App.4th at p. 228.)  Viewed in the light most favorable to the dependency court's finding, and giving due deference to the court's credibility determinations, there is substantial evidence to support the court's finding that Sasha's safety and physical or emotional well-being was not at substantial risk of detriment if she returned to mother's custody.

Although we uphold the order, the significant facts that would have supported a detriment finding justify careful monitoring of the success of the placement of minor with mother.  We have no reason to doubt that the Department, the experienced dependency court judge, and minor's counsel will diligently monitor minor's progress, and, if necessary, promptly take appropriate corrective actions.

**DISPOSITION**

The dependency court's findings and order returning S.M. to mother's custody are affirmed.

KRIEGLER, J.

We concur:

MOSK, Acting P. J.

BAKER, J.